IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STRICTLY F/X L.L.C., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PYROTECNICO F/X, L.L.C. and )<br>RONALD BLEGGI, )<br>)<br>)<br>)<br>Defendants. ) | 2:20-CV-00201-CCW |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Pyrotecnico F/X, L.L.C.'s ("Pyrotecnico") Motion in Limine to Exclude the Expert Opinion Testimony of Plaintiff Strictly F/X L.L.C.'s ("Strictly") Expert Paul Connolly. ECF No. 165. The Motion, which was file concurrently with the parties' cross-motions for summary judgment, ECF No. 167, ECF No. 169, ECF No. 174, is now ripe for disposition.

For the reasons that follow, Pyrotecnico's Motion in Limine will be DENIED.

## I.   Background

As the Court is issuing its opinion on the parties' cross motions for summary judgment concurrently with the issuance of this opinion, the Court refers to that opinion, ECF No. 229 for the background of this case.

The subject of the current Motion is Mr. Paul Connolly, who has worked at Kroll Inc. since 2014. ECF No. 166 at 1; ECF No. 161-1 at 7. Mr. Connolly is Strictly's expert witness, who was engaged to analyze the devices used by Defendant Ronald Bleggi in his employment with Strictly and Pyrotecnico and to analyze Mr. Bleggi's and Pyrotecnico's access to Strictly documents contained in a particular Dropbox account. ECF No. 166 at 1; ECF No. 161-1 at 7; ECF No. 185

In connection with his engagement, Mr. Connolly filed an initial expert report, dated July 2, 2021, ECF No. 166-1 and a supplemental disclosure, dated August 12, 2021, ECF No. 166-2 (together, the "Connolly Report"), and was deposed by Pyrotecnico on August 13, 2021, ECF No. 166-3.

The Connolly Report contains six conclusions regarding files on and connections between certain devices (a Seagate Hard Drive, the Pyrotecnico MacBook, the Strictly FX Surface, a Drobox account, and an LG Phone). *See* ECF No. 166-1 at 22–23;  ECF No. 166 at 2.

## II.   Legal Standard

### A.    Federal Rule of Evidence 702 and *Daubert* Standard

Under Federal Rule of Evidence 702, an expert who is qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case

Fed. R. Evid. 702.

District court judges, in their "'gatekeeping' obligation to insure that only reliable and relevant expert testimony be presented to jurors," must ensure that the expert testimony satisfies a "trilogy of restrictions":  qualification, reliability, and fit.  *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 111–12 (3d Cir. 2020) (citing Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2013)).  In doing so, "[t]he overriding consideration with regard to these three requirements

is that expert testimony should be admitted if it will assist the trier of fact." *Tyger*, 832 F. App'x, at 112 (citing United *States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995)).

Pyrotecnico seeks to exclude Mr. Connolly's testimony on the grounds that he is not qualified, and his opinions are not reliable.  ECF No. 166 at 4.

### III.    Analysis

#### A.    Mr. Connolly's Qualifications Under Rule 702

The Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli II*")).  A "broad range of knowledge, skills, and training qualify an expert as such." *Paoli II*, 35 F.3d at 741.  In evaluating whether "the witness possess[es] specialized expertise," *Schneider*, 320 F.3d at 404, the Court views both the asserted expert's "substantive" and "formal" qualifications liberally.  *Paoli II*, 35 F.3d at 741.  "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) (citing *Paoli II*, 35 F.3d at 741).

Pyrotecnico contends that Mr. Connolly "has neither formal training in computer forensics nor significant technical experience," and that his prior work as an electronic discovery attorney did not involve forensics.  ECF No. 166 at 5.  Rather, Pyrotecnico asserts that Mr. Connolly's expertise is related to managing forensic investigations—not actually performing such investigations himself.  *Id.*  Strictly responds that Mr. Connolly is qualified and that his deposition and curriculum vitae detail his computer forensic experience and his experience as a consulting expert in digital forensics in multiple cases.  ECF No. 185 at 5.

3

Pyrotecnico's contention that Mr. Connolly does not have formal training in computer forensics, but rather undergraduate degrees in English and Philosophy, ECF No. 166 at 6, is not dispositive on the issue of whether he is qualified under Rule 702. The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Paoli II*, 35 F.3d at 741. Thus, the Court turns to whether Mr. Connolly possesses a "broad range of knowledge, skills, and training" and views both the "substantive" and "formal" qualifications of an expert liberally. *Id.*

The argument that Mr. Connolly is not qualified, simply because he has never testified before is also unpersuasive. In advancing this argument, Pyrotecnico fails to account for Mr. Connolly's experience as consulting expert in multiple trade secrets cases and in other cases involving forensic collection, forensic evidence, and investigations. *See* ECF No. 166-1 at 58–61 (detailing prior experience). Further, Mr. Connolly testified that his involvement in forensic investigations started as early as 2008 and continued when he joined Kroll[1] in 2014. ECF No. 166-3 at 22:7–12 ("I was deeply involved in questions having to do with document metadata. I was involved in examining digital evidence, and, at times, because of the nature of the work, I was a consumer of forensics, computer forensic information."); *see also* ECF No. 166-3 at 34:2–24 (noting that in his 2014 position in eDiscovery and forensic investigations he "would go out into the field and perform, you know, image collection, data acquisition, and come back with data and perform forensic analyses" and "was trained by working with forensic experts").

Similarly, Pyrotecnico's arguments that Mr. Connolly has only collected data approximately six times in the field as late as 2018 ignores that much of the data in this case

---

[1] Mr. Connolly testified that he was hired by Duff & Phelps. After Duff & Phelps acquired Kroll, Mr. Connolly moved over to Kroll Cyber, a division that performed digital forensics and incident response, cybersecurity incident response. Duff & Phelps, itself, has been renamed as Kroll. ECF No. 166-3 at 32:14-33:11.

appears to have been collected by third parties and then analyzed by experts, such as Mr. Connolly and his team. *See* ECF No. 185 at 7 ("data in this case was often 'collected' by a third party other than Kroll, such as Bit-x-Bit (Pyrotecnico's vendor) or 4Discovery (the parties' neutral expert)") (citing ECF No. 166-3 at 36:23-37:14 ("data was collected by a party that was not even Kroll and provided in an image that we analyzed"); ECF No. 185-2 ¶¶ 4, 6)).

Finally, Pyrotecnico asserts that Mr. Connolly is merely acting as a spokesperson for other experts within Kroll who conducted the investigation, rather than having done so himself, because Mr. Connolly does not independently possess expertise as a computer forensic examiner. ECF No. 166 at 6–7 (citing *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 616 (7th. Cir. 2002)). Here, a review of Mr. Connolly's past experience, *see* ECF No. 166-1 at 58–61, and deposition regarding his involvement in this case do not convince the Court that Mr. Connolly is functioning as a mere spokesperson for his team members (Mr. Johan Dorado and Mr. Joel Bowers). *See* ECF No. 166-3 at 37:24–38:8 ("Q: … did you personally review the data that was on the Pyrotecnico MacBook? A. I did. Q. And in what form was the data provided to you to enable you to do that review? A. I was working with Johan Dorado, and … we put the data into a case management tool, and I reviewed it -- personally my review was with Johan once it was in the tool."); *id.* at 54:6–55:1 (testifying that both he and Mr. Dorado performed the analysis of Dropbox activity on the Pyrotecnico MacBook); *id.* at 55:8–16 ("I was helping to, …shape … the focus of the investigation and conferring with Johan about what we were finding and what next steps should be, and then at a certain point looking with Johan at the results … as we're finding them. So it was back and forth. … [T]hen, as we talked about, I worked on the report."); *id.* at 60:14–61:4 (describing, with respect to the 308 files found on a hard drive, how he "was reviewing the findings with Johan and with …. Joel Bowers, my two colleagues on this case, and then writing

about it…. the methodology was clear to me, and my work would have been… looking at the … output.").

From Mr. Connolly's deposition, it appears that his team members acted as "assistants in formulating his expert opinion," *Dura Auto.*, 285 F3d at 612, and that he has reviewed and formulated the opinions contained in the Kroll report such that he is not simply acting as a spokesperson for his team members.  ECF No. 166-3 at 52:6–18, 54:2–5 ("I was involved in the process, but Johan Dorado was performing a lot of the primary forensic examination work;  and we worked closely together, but he was the one who first put this -- put this into Magnet AXIOM and located that artifact. … I was not uninvolved in this as it was happening.  But yes, Johan Dorado … was deeply involved and I would say probably was the first person to go here and uncover this artifact.").  The Court will not exclude Mr. Connolly's testimony based on the fact that he worked with his team members during the investigation.  *See In re Suboxone Antitrust Litig.*, No. 2445 13-MD-2445, 2020 U.S. Dist. LEXIS 219949, at *56 (E.D. Pa. Nov. 24, 2020) (citing *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013)) ("Where the expert was directly involved with the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility.").

The Court concludes that in interpreting Rule 702's qualification requirement liberally, Mr. Connolly has a "broad range of knowledge, skills, and training" sufficient to qualify as an expert in this matter.  *Paoli II*, 35 F.3d at 741.

**B.     The Reliability of Mr. Connolly's Testimony**

To be reliable, an expert's testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief.  In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity."  *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (quoting *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590)).

The Third Circuit has identified factors that a district court should consider when determining whether proposed expert testimony is reliable:

> (1) whether a method consists of a testable hypothesis;  (2) whether the method has been subject to peer review;  (3) the known or potential rate of error;  (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted;  (6) the relationship of the technique to methods which have been established to be reliable;  (7) the qualifications of the expert witness testifying based on the methodology;  and (8) the non-judicial uses.

*Schneider*, 320 F.3d at 405 (3d Cir. 2003) (internal citations omitted).  "[T]he reliability analysis is 'lower than the merits standard of correctness' and is flexible in nature."  *United States v. Millhouse*, 346 F. App'x 868, 871 (3d Cir. 2009) (citing *Pineda*, 520 F.3d at 247–48 (internal quotation omitted) and *Paoli II*, 35 F.3d at 742 (outlining several factors to be considered)).  These factors "are neither exhaustive nor applicable in every case… [and t]he inquiry envisioned by Rule 702 is . . . a flexible one."  *Pineda*, 520 F.3d at 248 (internal citations and quotations omitted).

Pyrotecnico contends that Mr. Connolly did not perform the actual forensic analysis and failed to describe his methodology in a manner that would allow the Court to evaluate the reliability of Mr. Connolly's methodology.  *See* ECF No. 166 at 8–10 (listing descriptions of methodology in the Connolly Report);  ECF No. 213 at 4–5.  Strictly responds that Mr. Connolly provided

"extensive, specific testimony about how he employed the forensic tools, and he provides much more detail than [Pyrotecnico's expert] provided in his own report or at his deposition." ECF No. 185 at 9 (comparing Mr. Connolly's methodological description with Pyrotecnico's expert's methodological descriptions).

A review of the Connolly Report, ECF No. 166-1 & 166-2, in conjunction with Mr. Connolly's deposition detail how he and his team analyzed the data and came to the conclusions in the Connolly Report. *Compare* ECF No. 185 at 6–7 (extracting testimony related to conclusions) *with* ECF No. 166-1 at 22–23; *see generally,* ECF No. 166-3 (discussing each conclusion of the Connolly Report). Further, Pyrotecnico has not challenged the reliability of any specific computer programs that Mr. Connoly and his team used in analyzing the data. Even if it had, the Court notes both Strictly and Pyrotecnico's experts used many of the same forensic tools (notably, Axiom, Cellbrite, Encase) which Pyrotecnico's own expert has described as the "industry standard tools that allow for the processing and analysis of data, metadata of active space and unallocated space within a piece of media." ECF No. 185-3 at 9.

In considering several factors in the flexible reliability analysis, notably whether the methods are generally accepted and the qualifications of Mr. Connolly who is testifying on such methodology, which the Court discussed in Section III.A, the Court finds that Mr. Connolly's conclusions are not based on "the subjective belief or unsupported speculation," and that through his use of forensic analysis tools, which he has detailed in the Connolly Report and his deposition, Mr. Connolly has "'good grounds' for his on her belief." *Schneider*, 320 F.3d at 404. Therefore, Mr. Connolly's opinions are sufficiently reliable and will not be excluded.

**IV.    Conclusion**

For the foregoing reasons, Pyrotecnico's Motion in Limine IS HEREBY DENIED.


DATED this 29th day of June, 2022.


BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge




cc (via ECF email notification):

All Counsel of Record